**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

ATLANTIC DIAMOND TOOLS, INC.
*d/b/a* SENCORE DIAMOND TOOLS,
a Florida corporation,

Case No.

*Plaintiff,*

v.

JOSHUA A. BISHOP, an individual; and
BISHOP & SON ENTERPRISES LLC,
*d/b/a* PRECISION EDGE CO,
a Florida limited liability company,

*Defendants.*
_____________________________________________/

## VERIFIED COMPLAINT

Atlantic Diamond Tools, Inc. *d/b/a* Sencore Diamond Tools ("Sencore" or "Plaintiff"), by and through its undersigned counsel, files this Verified Complaint against defendants Joshua A. Bishop ("Bishop") and Bishop & Son Enterprises LLC *d/b/a* Precision Edge Co ("BSE," "Bishop Enterprises," or "Precision Edge") (collectively, "Defendants") and in support thereof state:

## INTRODUCTION

1. Sencore is a leading nationwide supplier of diamond tools and related products, recently generating approximately $12 million in annual revenue. Sencore has built its business over many years through the development of patented products, deep customer relationships, proprietary pricing strategies, and a comprehensive customer relationship management ("CRM") database containing approximately 37,000 customer records. The goodwill and trade secrets embodied in these assets are the lifeblood of Sencore's enterprise.

2. Bishop was a long-term Account Manager at Sencore who was given valuable Sencore accounts and, because of that, was personally responsible for approximately $2 million of

Sencore's recent annual revenue and had significant access to Sencore's most confidential and proprietary business information, its CRM database.

3. As a condition of his continued at-will employment, Bishop executed a Confidentiality, Non-Solicitation, and Non-Competition Agreement (the "Agreement"), the same form of agreement that every Sencore employee is required to sign. The executed original was kept in Bishop's personnel file, which was stored with every other employee's file in a file cabinet in a locked room in Sencore's administrative and sales office. Bishop had a key to that room.

4. Bishop planned his departure for months. While still employed by Sencore:

(a) on March 16, 2026, he formed BSE with the Florida Department of State,

(b) on July 16, 2026, from his Sencore e-mail account, he e-mailed himself to his personal e-mail account a manufacturer's pricing list to price out his cost of production for a competitive enterprise; and

(c) on July 25, 2026, he registered the fictitious name Precision Edge Co to be ready to compete with Sencore immediately upon departure.

5. Bishop resigned from Sencore on September 10, 2026.

6. Upon information and belief, before resigning, and unbeknownst to Sencore at the time, Bishop removed his entire personnel file, including his original, signed Agreement, and has either retained or destroyed it. Every other employee's file remains intact; only Bishop's is missing.

7. Days after resigning, and principally on a weekend when he expected Sencore would not notice, **Bishop infiltrated Sencore's CRM database and exported up to 37,000 customer records, which is the entirety of Sencore's customer database**.

8. Through BSE, Bishop now sells diamond tools and related products in direct competition with Sencore by actively soliciting customers whose trade-secret information he took.

9. Bishop is not hiding it. He promotes his competing business on social media, including TikTok under the handle @joshthebladeguy, where he boasts about his competitive activities and solicits Sencore's customers. **In one video, Bishop narrates and records himself marketing competing products directly to one of Sencore's customers**. That video is Bishop's own public record of his breach of the Agreement and his violation of federal and Florida law.

10. Every day that passes, Bishop and BSE use Sencore's stolen data to divert the customer relationships Sencore has spent more than a decade building. Sencore therefore seeks urgent injunctive relief, including a temporary restraining order and preliminary and permanent injunctions, as well as compensatory damages and all other relief this Court deems just and proper.

## THE PARTIES

11. Plaintiff is a Florida corporation with its principal place of business in Palm Beach County, Florida.

12. Defendant Bishop is an individual who resides in Palm Beach County, Florida. For over ten years, and until September 10, 2026, Bishop was employed by Sencore as an Account Manager.

13. Defendant BSE is a Florida limited liability company with a principal place of business in Palm Beach County, Florida. Defendant Bishop is listed as both the registered agent and officer of Bishop Enterprises.

## JURISDICTION AND VENUE

14. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because Sencore asserts a claim under, and Bishop has violated, the Defend Trade

Secrets Act, 18 U.S.C. § 1836 *et seq.*, which provides a civil cause of action for trade secret misappropriation involving products or services used or intended for use in interstate commerce.

15. Sencore's trade secrets, including its proprietary CRM database containing approximately 37,000 customer records for customers across the country, are related to products sold in interstate commerce, namely Sencore's patent-protected diamond tools. Sencore sells to customers throughout the United States, including customers in Florida, Georgia, Alabama, Texas, Tennessee, California, New York, Pennsylvania, Illinois, Ohio, and other states. Sencore regularly ships its products across state lines, and its business operations are inherently interstate in nature.

16. This Court has supplemental jurisdiction over Sencore's state law claims pursuant to 28 U.S.C. § 1367(a), including its claims under the Florida Uniform Trade Secrets Act, Florida Statutes § 688.001 *et seq.*, and its claims for breach of contract, breach of fiduciary duty, tortious interference, and conversion. These state law claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Sencore's principal place of business is located in Palm Beach County, within this District. The wrongful acts giving rise to this action occurred in substantial part in this District, including Bishop's unauthorized access to Sencore's CRM system after his resignation from Sencore, his solicitation of Sencore's customers after his resignation from Sencore, and upon information and belief, his removal of his personnel file from Sencore's office prior to his resignation. Bishop resided and worked in Palm Beach County during most of his employment with Sencore.

## FACTUAL BACKGROUND

### A. Sencore's Business

18. Sencore's product lines include diamond blades, core bits, grinding cups, polishing pads, and other specialized equipment used in construction, stone fabrication, and concrete industries.

19. Sencore recently generated approximately $12 million in annual revenue and sells its products to customers located throughout the United States. Sencore currently has approximately 30 employees, all of whom have signed restrictive covenant agreements.

20. Sencore historically has maintained a proprietary CRM system known as Method CRM. This CRM system contains approximately 37,000 customer records, including detailed contact information, purchasing histories, pricing terms, product preferences, order frequencies, credit terms, and sales notes. This database represents the accumulated work product of many years of business development and constitutes one of Sencore's most valuable trade secrets and proprietary business assets. Although Sencore has recently begun migrating its data to a new CRM vendor, Sencore's proprietary customer database has resided in Method CRM at all relevant times.

21. Sencore has invested substantial time, money, and effort in developing and maintaining its customer relationships and the confidential information stored in its CRM system. Sencore takes reasonable measures to protect the confidentiality of this information, including limiting CRM access to authorized employees; expending substantial funds on custom security modifications that restrict each sales representative to viewing only his or her assigned accounts; maintaining password protections; and requiring employees to execute confidentiality, non-solicitation, and non-competition agreements. These measures were reasonable under the circumstances. Because Sencore's CRM vendor added a new interface to Sencore's accounts

without Sencore's knowledge or request, a security vulnerability existed of which Sencore lacked knowledge, but which an employee could exploit to circumvent Sencore's custom security restrictions; Bishop knew of that gap and exploited it. *See* ¶¶ 44 to 60, below.

**B. <u>Bishop's Employment with Sencore</u>**

22. Bishop was employed by Sencore as an Account Manager and salesman. Sencore first hired Bishop in or about 2009 and later terminated his employment. Sencore rehired him on or about January 11, 2016 and he initially worked for Sencore from Ohio, but he shortly relocated to Florida where he continued to work for Sencore continuously until resigning on September 10, 2026. In his role, Bishop was responsible for managing key customer accounts that Sencore assigned to him, generating sales revenue for Sencore, troubleshooting customer issues post-sale, and maintaining customer satisfaction. Importantly, while in Ohio, Bishop was responsible for ensuring Sencore's Ohio employees submitted a complete personnel file, which included *inter alia* employee-executed restrictive covenant agreements (*i.e.*, confidentiality, non-solicitation, and non-competition agreements).

23. Bishop's recent sales success was built on Sencore's customers, which directly increased his compensation as it was commission-based. Over the years, Sencore assigned Bishop some of its best and most profitable accounts. When other Sencore sales representatives departed, Sencore regularly reassigned their top customers to Bishop. As a result, by the time of his resignation, Bishop was personally responsible for approximately $2 million of Sencore's $12 million in annual revenue, approximately one-sixth of Sencore's entire business, and he was one of Sencore's most significant revenue producers. Sencore compensated Bishop accordingly: most recently, he was on track to earn approximately $250,000 annually. Due to his tenure, Bishop had

intimate knowledge of Sencore's customer base, pricing structures, and competitive strategies. Now, Bishop is using that knowledge to take from Sencore the very customers it entrusted to him.

24. Specifically, in his capacity as Account Manager, Bishop had extensive access to Sencore's confidential and proprietary business information, including but not limited to: (a) access to Sencore's CRM system for the customer accounts assigned to him; (b) customer purchasing histories and order patterns for his assigned accounts; (c) confidential pricing data, including customer-specific pricing, volume discount structures, and margin information; (d) Sencore's sales strategies, business plans, and marketing approaches; (e) customer lists and contact information for his assigned accounts, including decision-maker names, telephone numbers, and email addresses; (f) customer credit terms and payment histories; and (g) Sencore's vendor relationships and cost structures.

25. Bishop had a physical key to Sencore's office building, including the deadbolt lock on the front entrance. This key gave Bishop the ability to access the building after business hours and on weekends without supervision. The file cabinet containing employee personnel files, including Bishop's own file containing his signed Agreement, was located inside Sencore's administrative office within the building.

26. Bishop's company email address was josh@sencoretools.com, through which he communicated with customers and conducted business on Sencore's behalf.

**C. <u>Bishop Executed a Non-Compete and Non-Solicitation Agreement</u>**

27. When Bishop returned to Sencore in January 2016, he signed a restrictive covenant agreement that was subsequently superseded and replaced.

28. Between February 2019 and March 2019, and as a condition of his continued employment, Bishop executed the Agreement, an updated Confidentiality, Non-Solicitation, and

Non-Competition Agreement, in the presence of JD Lubitz, who is Sencore's Director of Operations. An unsigned copy of the Agreement is attached as **Exhibit A**.

29. The execution of such an agreement was and is Sencore's standard business practice. Sencore's employees have always been required to sign some form of restrictive covenant agreement upon hiring as a condition of employment. In or around February or March 2019, Sencore's counsel prepared a new restrictive covenant agreement for employees (the Agreement attached as Exhibit A), and at that time, every employee of Sencore was required to execute that form of agreement as a condition of their continued employment, including Bishop.

30. The specific material terms of the Agreement include:

(a) **Confidentiality**: Employees may not use or disclose Sencore's confidential information, business secrets, or business opportunities, including customer and supplier lists, business plans, and sales, cost, profit, and pricing data, during or after their employment with Sencore, except in performing the employee's duties while employed by Sencore and in furtherance of Sencore's best interests, Exhibit A § 1.A.;

(b) **Non-Solicitation of Customers**: For one (1) year after termination, employees may not directly or indirectly solicit any past, current, or prospective Sencore customer, *id.* § 1.B.;

(c) **Non-Solicitation of Employees and Vendors**: For one (1) year after termination, employees may not solicit or hire anyone employed or engaged by Sencore within the prior six months, or induce any subcontractor, vendor, or supplier to alter its relationship with Sencore, *id.* § 1.C.;

(d) **Non-Competition**: For one (1) year after termination, Employees may not work for, provide services to, or own any interest in a business that makes or sells diamond blades or tools, *id.* § 1.D.;

(e) **Tolling**: Each one-year period is extended day-for-day during any violation, *id.* § 2; and

(f) **Return of Property**: Upon termination, employees must immediately return all Sencore property, including data, documents, customer lists, keys, and "Confidential Information" as that term is defined in the Agreement, *id.* § 1.A.

31. The signed Agreement, which upon information and belief Bishop removed and has either retained or destroyed, is enforceable under Florida law. Florida Statutes § 542.335 expressly authorizes and enforces restrictive covenants that are: (a) set forth in a writing signed by the person against whom enforcement is sought; (b) entered into in connection with a legitimate business interest; and (c) reasonable in scope and duration.

32. Bishop's execution of the Agreement was personally witnessed by JD Lubitz, who is Sencore's Director of Operations.

33. Sencore's legitimate business interests protected by the Agreement include, without limitation: (i) trade secrets, as defined in Florida Statutes § 688.002(4), such as Sencore's proprietary CRM database of approximately 37,000 customer records and their purchasing histories and pricing terms, and Sencore's confidential pricing data and margin information; (ii) valuable confidential business or professional information that otherwise does not qualify as trade secrets, such as Sencore's sales strategies and vendor relationships; (iii) substantial relationships

with specific prospective or existing customers; and (iv) customer goodwill associated with Sencore's ongoing business. *See* Fla. Stat. § 542.335(1)(b).

34. Sencore's CRM database is a trade secret under section 688.002(4) because it is a compilation of customer information, built over many years, that derives independent economic value from not being generally known to or readily ascertainable by competitors or others, and Sencore protects its secrecy through access restrictions, password protections, and confidentiality agreements. *See* Fla. Stat. § 688.002(4).

35. Although the Agreement does not specify a geographic scope, it nevertheless meets all three requirements as Florida law implies a reasonable geographic limitation. *See* Fla. Stat. § 542.335(c) (providing judicial power to "modify" a contractual restraint); *Santana Prods. Co. v. Von Korff*, 573 So. 2d 1027, 1028 (Fla. 2d DCA 1991) ("where the parties have endeavored to enter into a noncompete agreement which otherwise appears reasonable and valid but for the absence of a geographical or time restriction, courts have enforced the agreement by modifying its terms to include a reasonable geographical or time restriction, thus giving effect to the agreement so modified") (citing *Joseph U. Moore, Inc. v. Neu*, 500 So. 2d 561 (Fla. 2d DCA 1986)). In addition, the Agreement provides for judicial power to modify the restraints in the event of any unenforceability or invalidity. Exhibit A, § 8.

36. Upon information and belief, while still employed by Sencore, Bishop used his after-hours key access to remove his entire personnel file, including the executed original of his Agreement, from Sencore's file cabinet, and he has either retained or destroyed it, in order to deprive Sencore of the ability to enforce its contractual rights after his planned departure. Sencore's information and belief is based on the following facts: (a) the executed original of the Agreement was kept in Bishop's personnel file, which was stored with every other employee's file

in a file cabinet in a locked room in Sencore's office; (b) Bishop had a key to that room and to the deadbolt on the building's front entrance, which gave him unsupervised access after business hours and on weekends; (c) Bishop's personnel file is missing, while every other employee's file remains intact; (d) Sencore requires every employee to sign the same form of agreement, and an audit of Sencore's records located 453 signed forms for the 445 people Sencore has hired,[1] with signed agreements on file for all 30 current employees; (e) Bishop understood the significance of the personnel file because, while working from Ohio, he was responsible for ensuring that Sencore's Ohio employees submitted complete personnel files, including their executed restrictive covenant agreements; (f) Bishop had a motive to eliminate the Agreement, because he secretly formed BSE in March 2026, registered its fictitious name in July 2026, and in July 2026 emailed himself a manufacturer's price list so he could begin competing immediately after resigning.

37. Notwithstanding the absence of the executed original, the existence and terms of Bishop's Agreement are established by multiple sources of evidence, including:

a. Sencore's standard and routine business practice of requiring every employee to execute the same form of Confidentiality, Non-Solicitation, and Non-Competition Agreement as a condition of continued employment. This routine practice is admissible to prove Bishop signed the Agreement. *See* Fla. Stat. § 90.406 (evidence of routine practice of an organization is admissible to prove that the conduct of the organization on a particular occasion was in conformity with the routine practice).

b. The verification of JD Lubitz, Sencore's Director of Operations, who has personal knowledge that Bishop executed the Agreement, in Mr. Lubitz's

---

[1] There are more forms than hired employees in part because some individuals filled out forms but did not commence working, and in part because some employees were re-hired and completed paperwork for each separate hiring event.

presence, as a condition of Bishop's continued employment and that the executed original was maintained in his personnel file.

c. A blank template of the Confidentiality, Non-Solicitation, and Non-Competition Agreement used by Sencore for all employees, which is attached as Exhibit A and is identical in form to the Agreement signed by Bishop.

d. Bishop's own knowledge as Bishop signed the Agreement. Bishop is fully aware of the existence and terms of the Agreement he executed.

38. Under both federal and Florida law, where the original of a document is unavailable through no fault of the proponent, including where the opposing party controls the original and fails to produce it, the contents of the document may be proved by other evidence. *See* Fed. R. Evid. 1004(a), (c); Fla. Stat. § 90.954(1), (3). Here, the original is unavailable to Sencore through no fault of its own because, upon information and belief and for the reasons alleged in Paragraph 36, Bishop removed it and has either retained or destroyed it, and a wrongdoer should not profit from his own misconduct. *Cf.* Fla. Stat. § 673.3091 (reflecting the related principle that a person entitled to enforce a negotiable instrument is not precluded from doing so when the instrument has been lost, destroyed, or stolen).

**D. <u>Bishop's Pre-Resignation Plan to Compete and His Resignation</u>**

39. Unbeknownst to Sencore during his employment, Bishop had already been planning his departure and competitive scheme for months. He secretly formed Bishop Enterprises in March 2026 approximately six months before his resignation, and registered its fictitious name to do business in July 2026, just over a month before his resignation.

40. In addition, in July 2026, Bishop e-mailed himself (from his Sencore e-mail address to his personal e-mail address) a copy of a product manufacturer's price list so that Bishop could begin sourcing product to have his new business up and running immediately after his resignation.

41. Then, on September 10, 2026, Bishop resigned from his position as Account Manager at Sencore and almost immediately began competing and soliciting Sencore's customers.

**E. <u>Bishop's Unauthorized Access to Sencore's CRM System</u>**

42. Throughout Bishop's employment and when he resigned, Sencore's CRM system operated through Method CRM, which is integrated with QuickBooks Desktop.

43. Method is a browser-based web application accessible at the URL of Method.me.

44. Sencore's employees accessed Method through a portal referred to as "Classic CRM," through which they accessed, updated, and managed Sencore's customer database on a day-to-day basis.

45. Sencore invested substantial time and money to build Classic CRM into a secure, customized system tailored to its business. Sencore hired a developer from Method (the CRM vendor) to customize the Classic CRM system to fit Sencore's business needs. The initial build-out took approximately three to four months, and Sencore continued to commission additional modifications over time. In total, Sencore paid approximately $20,000 to $30,000 for that custom development, in addition to ongoing subscription fees of $40.00 per user per month and the time its personnel devoted to building out and maintaining the system.

46. One modification restricted each sales representative's access so that the representative could view only the accounts assigned to him or her, preventing sales representatives from accessing other representatives' assigned customer accounts.

47. Additionally, the Classic CRM system was configured so that users could read and write data, but could not download or export customer data in bulk.

48. The Classic CRM system, as modified, was the system Sencore trained its employees on and instructed its employees to use.

49. As part of logging in, the user encounters the following prompt on Method.me:




50. By clicking on the words "Go to classic version," the user then enters the Classic CRM that Sencore used and instructed its employees to use to conduct their daily business.

51. Unbeknownst to Sencore for some time, Method rolled out a "new" version of its product and made that new version available to Sencore's employees by clicking the drop-down button on the right in the image above and selecting New, as indicated in the image below (continued on the following page):




52. Sencore did not ask Method to provide its employees access to the new version ("Method:New"), Method simply added it to Sencore's accounts.

53. When Method pushed Method:New into Sencore's account, all of Sencore's CRM data became accessible through it to anyone with Classic CRM credentials, but none of Classic CRM's custom security restrictions carried over. Sencore did not know that. Because Method rolled out Method:New unilaterally, without Sencore's knowledge or request, Sencore had no reason to know of that gap. Bishop, who worked in the system daily, eventually knew of it and exploited it following his departure.

54. On September 10, 2026, immediately after Bishop resigned – before he even left the parking lot that day – Sencore deactivated Bishop's ability to sign-in to the Classic CRM portal, as indicated in the below image (continued on the next page):




55. By unchecking the "User can sign-in" box, and ensuring "Login is **Active**" was unchecked, Sencore reasonably believed that Bishop could no longer access Sencore's CRM database upon his resignation.

56. Unbeknownst to Sencore, however, while the deactivation cut off Bishop's access to Classic CRM, it did not prevent him from logging in to Method:New, which, also unbeknownst to Sencore, did not have the enhanced security customizations that Sencore implemented for Classic CRM.

57. Bishop exploited that gap within two days of his September 10, 2026 resignation. Between September 12 and September 18, 2026, there were six sign-in events to the Method:New portal originating from IP address 73.124.212.48. This IP address is associated with Bishop's personal internet connection.

58. Between September 18 and September 19, 2026, there were six contact data exports from Sencore's account on Method CRM, resulting in the export of up to 37,000 customer contacts,

which is the entirety of Sencore's customer database. These exports included customer names, contact information, purchasing histories, and other confidential business data.

59. Sencore first became aware of Bishop's continued unauthorized access on September 21, 2026, when Sencore received a notification from Method advising that a data export had been completed from Bishop's account. Sencore immediately investigated and quickly discovered the security gap between the Classic CRM and Method:New systems.

60. As part of Sencore's investigation, JD Lubitz called Method support. During those series of calls, Method advised that Bishop's access to the Method:New portal had not been fully deactivated. Although Bishop's "User can sign in" setting was deactivated in Classic CRM, his account remained marked as "Active" in the Method:New system and his Method:New account membership remained enabled. This incomplete deactivation inadvertently left a backdoor through which Bishop could continue to access Sencore's CRM data via the Method:New portal, even though his Classic CRM access had been revoked. Upon learning this, Sencore resolved the vulnerability and reported the unauthorized intrusion to the Palm Beach Gardens Police Department (Case No. 26004820), but Bishop's pilfering was already completed.

61. Method CRM prepared an Incident Evidence Report, Reference No. PL-65934, dated September 22, 2026 (the "Incident Report"), which confirmed the unauthorized sign-in events and data exports described above. The Incident Report documented the timestamps, IP addresses, and scope of the unauthorized access and data exfiltration. A copy of the Incident Report is attached as **Exhibit B**.

F. **Bishop Establishes a Competing Business**

62. Bishop Enterprises, which Bishop secretly formed on or about March 16, 2026 while still employed by Sencore, is registered with the Florida Department of State, Division of Corporations. Bishop is listed as both its registered agent and its only listed officer.

63. Bishop Enterprises is engaged in the business of selling diamond tools and related products — the same products that Sencore sells — in direct competition with Sencore. Bishop, through and with Bishop Enterprises, is actively operating, soliciting customers, and competing for business that would otherwise go to Sencore.

64. Bishop's own emails confirm that Bishop Enterprises is actively generating revenue. Between September 15 and September 28, 2026, Bishop Enterprises sent Bishop at least $4,400.00 via Zelle, with transaction memos referencing "work" and "sales." Chase's Zelle notifications for each of these payments, which state that "BISHOP & SON ENTERPRISES LLC sent you money," were delivered to Bishop's Sencore email address, josh@sencoretools.com.

65. Specifically, Bishop Enterprises has made at least the following payments to Bishop: $500.00 on September 15, 2026 (memo: "work"); $500.00 on September 16, 2026 (memo: "work"); $600.00 on September 18, 2026 (memo: "sales"); $500.00 on September 19, 2026 (memo: "Work"); $500.00 on September 23, 2026 (memo: "Sales"); $500.00 on September 25, 2026 (memo: "Work"); $700.00 on September 27, 2026; and $600.00 on September 28, 2026 (memo: "Work"). In addition, Bishop has made a sale in connection with an October 8, 2026 Amazon shipment of a power tool to one of Sencore's lawn care customers based in Texas. These payments demonstrate that Bishop Enterprises is actively conducting business and generating income from sales during the restricted period.

66. Bishop Enterprises is utilizing the confidential customer information that Bishop misappropriated from Sencore's CRM system, including the up-to 37,000 customer records that Bishop exported between September 18 and 19, 2026, to target and solicit Sencore's existing customers. Bishop has already sold competing products to Sencore customers, including multiple landscape and lawn care customers and multiple concrete customers. When Sencore contacted several of these customers, they confirmed they had purchased from Bishop.

### G. Bishop's Public Social Media Activity Evidences Ongoing Breach

67. Bishop maintains a public TikTok account under the handle @joshthebladeguy, the same moniker he uses for his personal email address (Joshthebladeguy@gmail.com). Through this publicly accessible account, Bishop promotes Bishop Enterprises and solicits customers for the sale of diamond blades and tools in direct competition with Sencore.

68. In particular, on September 24, 2026, Bishop posted a publicly viewable video at https://www.tiktok.com/@joshthebladeguy/video/7689201432528047374, which depicts Bishop marketing and selling diamond tools ***to one of Sencore's customers*** located in Florida in direct competition with Sencore, thereby evidencing his breach of the non-competition and non-solicitation provisions of his Agreement. As recently as October 9, 2026, Bishop continues to publicly broadcast his competitive activity in Sencore's line of business.

69. Bishop's TikTok posts constitute public admissions of his competing activity, his solicitation of customers in the diamond tools industry, and his operation of BSE in direct competition with Sencore.

### H. Bishop's Response to Sencore's Cease-and-Desist

70. On September 21, 2026, Sencore discovered Bishop’s continued unauthorized access and, acting promptly, through counsel sent a cease-and-desist letter to Bishop demanding that he: (a) immediately cease all competing activity in violation of his Agreement; (b) immediately cease soliciting Sencore’s customers; (c) return all Sencore property in his possession, including his personnel file and all confidential data; (d) delete all copies of Sencore’s customer data and confirm such deletion; and (e) comply with all terms of the Agreement.

71. Bishop responded to Sencore’s cease-and-desist letter without substantively addressing the demands set forth in Sencore’s letter other than noting he would preserve data.

72. Bishop did not cease his competing activity, did not return Sencore’s property or confidential data, and did not comply with the terms of his Agreement. Instead, Bishop continued to operate BSE, continued to solicit Sencore’s customers, and continued to use Sencore’s misappropriated trade secrets, all in open defiance of his contractual and legal obligations.

73. On October 2, 2026, Sencore, through counsel, sent Bishop and BSE a second cease-and-desist letter and final demand before litigation, demanding that they, by October 7, 2026: (a) immediately cease all competing activity; (b) cease all contact with Sencore’s customers, vendors, suppliers, and employees; (c) return all Sencore property, including the up to 37,000 CRM records, all copies in any format, and all other Sencore confidential information in their possession, custody, or control, and certify under oath that all such property had been returned; and (d) preserve all documents, electronically stored information, and electronic devices relating to Bishop’s employment, separation, CRM access, Bishop Enterprises, and contact with Sencore’s customers, vendors, and employees.

74. On October 5, 2026, Bishop through counsel responded to advise of his representation (without indicating any representation of BSE), acknowledge receipt of the cease-and-desist letters, and express an intention to respond substantively the week of October 12th.

75. As of the time of the filing of this complaint, Bishop's counsel has provided no substantive response

76. Neither Bishop nor BSE complied with the material demands of the letters

77. All conditions precedent to the institution of this action have occurred or been performed.

78. Sencore has retained the undersigned legal counsel for this matter and agreed to pay counsel reasonable attorneys' fees.

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT

(Against Both Defendants)

79. Sencore re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 78 above as though fully set forth herein.

80. The Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, provides a private cause of action for misappropriation of trade secrets that are related to a product or service used in, or intended for use in, interstate or foreign commerce.

81. Sencore's is the owner of its trade secrets, including its proprietary CRM database containing approximately 37,000 customer records, customer pricing data, purchasing histories, and customer-specific business information, are related to products and services used in interstate commerce, as specified in Paragraphs 15 and 19 of this complaint.

82. Sencore has taken reasonable measures to keep its trade secrets confidential, including limiting access to its CRM system to authorized employees; paying for custom security

modifications to its Classic CRM system that restrict each sales representative to viewing only his or her assigned accounts and that prevent users from downloading or exporting customer data in bulk; instructing its employees to use only the Classic CRM system as modified; maintaining password protections; deactivating departing employees' login credentials; and requiring all employees to execute confidentiality, non-solicitation, and non-competition agreements as a condition of employment. These measures were reasonable under the circumstances. Because Method unilaterally pushed the Method:New portal into Sencore's account without Sencore's knowledge or request, Sencore had no reason to know the security restrictions configured in Classic CRM had not carried over to Method:New; Bishop knew of that gap and exploited it. *See* 18 U.S.C. § 1839(3)(A).

83. Sencore's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. *See* 18 U.S.C. § 1839(3)(B).

84. Bishop misappropriated Sencore's trade secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring them through improper means and by disclosing or using them without Sencore's consent. Specifically, Bishop accessed Sencore's Method CRM system without authorization after his resignation on September 10, 2026, and exported up to 37,000 customer records — Sencore's entire customer database — between September 18 and 19, 2026.

85. Bishop's acquisition of Sencore's trade secrets was accomplished through "improper means" within the meaning of 18 U.S.C. § 1839(6), including theft, unauthorized access to Sencore's computer systems after his authorization had ended, breach of a duty to maintain secrecy, and breach of a duty to limit use of Sencore's confidential information.

86. Bishop has disclosed or used, and continues to disclose or use, Sencore's misappropriated trade secrets for the benefit of his competing business, BSE. Bishop is using Sencore's confidential customer data to identify and target Sencore's customers, to inform pricing decisions, and to unfairly compete with Sencore in the diamond tools market.

87. Bishop Enterprises is liable for misappropriation under 18 U.S.C. § 1836 because it acquired Sencore's trade secrets from Bishop with knowledge, or reason to know, that such trade secrets were acquired by improper means, and has used and continues to use those trade secrets to compete unfairly with Sencore.

88. As a direct and proximate result of Defendants' misappropriation of Sencore's trade secrets, Sencore has suffered and continues to suffer damages, including but not limited to: (a) the actual loss caused by the misappropriation; and (b) the unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss. 18 U.S.C. § 1836(b)(3)(B).

89. Defendants' misappropriation was willful and malicious. Bishop deliberately accessed Sencore's CRM system without authorization after his employment ended, exported Sencore's customer database, and has used that information to compete directly with Sencore. Pursuant to 18 U.S.C. § 1836(b)(3)(C), Sencore is entitled to exemplary damages in an amount not more than two times the amount of damages awarded under 18 U.S.C. § 1836(b)(3)(B).

90. Defendants' misappropriation is ongoing and threatens to continue. Defendants remain in possession of the up to 37,000 customer records Bishop exported from Sencore's CRM system. Despite Sencore's cease-and-desist letter, Defendants have not returned Sencore's data, have not deleted it or confirmed its deletion, and continue to use it to solicit Sencore's customers.

Bishop and BSE have already sold competing products to Sencore customers, including a landscaping customer located in Ohio and two concrete contractor customers located in Iowa.

91. Sencore is suffering and will continue to suffer irreparable harm unless Defendants are enjoined. Bishop obtained Sencore's customer data covertly through weekend exports from the un-deactivated Method:New portal using his home IP address, and Defendants still possess the exported data. Bishop has already used that data to sell competing products to a landscaping customer located in Ohio and two concrete contractor customers located in Iowa, is soliciting other Sencore customers, and refused Sencore's September 21, 2026 cease-and-desist demands to stop, return, and delete Sencore's data. These actual uses, Bishop's continued possession of the data, and his refusal to return it make the threat of further use and disclosure actual and imminent, not speculative. Each further use or disclosure diverts customer relationships and goodwill that Sencore built over more than a decade, including accounts generating approximately $2 million of Sencore's annual revenue, and the resulting lost customers, lost future business, and lost goodwill cannot be readily calculated in money.

92. Sencore has no adequate remedy at law. Money damages cannot restore the secrecy of Sencore's trade secrets, recover customer relationships once they are lost, or stop Defendants' continuing use of Sencore's data.

93. The threatened injury to Sencore outweighs any harm an injunction may cause Defendants. An injunction would require Defendants only to stop using information they have no right to possess and to return it. Defendants have no legitimate interest in using stolen trade secrets.

94. An injunction would serve the public interest. The public has a strong interest in protecting trade secrets, enforcing the policies of the Defend Trade Secrets Act, and preventing unfair competition based on stolen information.

95. Pursuant to 18 U.S.C. § 1836(b)(3)(A), Sencore seeks temporary, preliminary, and permanent injunctive relief to prevent Defendants' actual and threatened misappropriation and will be filing a motion therefor imminently. This includes an order (a) prohibiting Defendants from accessing, using, or disclosing Sencore's trade secrets; (b) prohibiting Defendants from using Sencore's trade secrets to solicit or do business with Sencore's customers; (c) requiring Defendants to identify under oath all copies of Sencore's trade secret information, the location of each copy, all transfers of that information, and every person who received it; (d) requiring Defendants to preserve all Sencore data and all devices, cloud accounts, and email accounts containing or potentially containing it, and to submit those devices and accounts to a neutral forensic examiner for forensic imaging and preservation; (e) requiring Defendants to return all of Sencore's trade secret information; (f) requiring, only after forensic imaging and preservation are complete and under the examiner's supervision, Defendants to delete all copies of Sencore's trade secret information and certify the deletion under oath; and (g) requiring Defendants to provide a sworn compliance report within 7 days.

96. This relief is based on evidence of Defendants' actual misappropriation, not merely on information Bishop knows, and it does not prevent Bishop from entering into an employment relationship. 18 U.S.C. § 1836(b)(3)(A)(i).

97. Pursuant to 18 U.S.C. § 1836(b)(3)(D), Sencore is entitled to an award of reasonable attorney's fees against Defendants.

WHEREFORE, Sencore respectfully requests that this Court enter judgment on Count I in its favor and against Bishop and BSE, and grant the following relief:

a. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Bishop and BSE from accessing, using, or disclosing Sencore's trade secrets and from

directly or indirectly soliciting, contacting, or doing business with any customer of Sencore, including but not limited to all customers reflected in Sencore's CRM database;

b. An order requiring Bishop and BSE to return to Sencore all copies of Sencore's confidential customer data, in accordance with the preservation and forensic-imaging procedures set forth below, and to identify under oath all copies of Sencore's data, the location of each copy, all transfers of that data, and every person who received it;

c. An order requiring Bishop and BSE to preserve all Sencore data and all devices, cloud accounts, and email accounts containing or potentially containing it, and to submit those devices and accounts to a neutral forensic examiner for forensic imaging and preservation; after imaging and preservation are complete and under the examiner's supervision, to delete and permanently destroy all copies of Sencore's confidential customer data in their possession, custody, or control and to certify such deletion and destruction under oath, and to provide a sworn compliance report within 7 days;

d. An order requiring Bishop and BSE to provide a complete accounting of all business transacted with any Sencore customer since Bishop's resignation on September 10, 2026, including identification of each customer contacted, the nature and amount of each transaction, and the revenue and profits derived therefrom;

e. Damages for actual loss and unjust enrichment, and exemplary damages of up to two times that amount, under 18 U.S.C. § 1836(b)(3)(B)–(C), in an amount to be determined at trial;

f. Reasonable attorney's fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D);

g. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

h. Such other and further relief as this Court deems just and proper.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT**
(Against Both Defendants)

98. Sencore re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 78 above as though fully set forth herein.

99. The Florida Uniform Trade Secrets Act ("FUTSA"), Florida Statutes §§ 688.001–688.009, provides a cause of action for the misappropriation of trade secrets.

100. FUTSA defines a "trade secret" as information, including a compilation, that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Fla. Stat. § 688.002(4)(a)-(b).

101. Sencore's CRM database and constituent compilation of customer records constitute trade secrets as the database and records were acquired or compiled through the industry of the owner of the list, Sencore, and is not just a compilation of information commonly available to the public.

102. Sencore's CRM database is a trade secret under section 688.002(4). It is a compilation of approximately 37,000 customer records, built over more than a decade at substantial expense, containing customer contact information, purchasing histories, pricing terms, product preferences, order frequencies, credit terms, and sales notes. That compilation is not

available from public sources, is the product of Sencore's own industry, and gives Sencore a competitive advantage because competitors cannot readily ascertain which customers buy what products, at what prices, and on what terms. Sencore's confidential pricing data, margin information, and customer-specific business information described in Paragraphs 20 and 24 likewise qualify as trade secrets.

103. Sencore has taken efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets, as alleged in Paragraphs 21, 29, 30(a), 36(d), 45 through 48, 54, and 55, including limiting CRM access to authorized employees; paying for custom security modifications that restrict each sales representative to his or her assigned accounts and prevent bulk downloads or exports; maintaining password protections; deactivating departing employees' login credentials; and requiring every employee to execute a confidentiality agreement. Fla. Stat. § 688.002(4)(b).

104. FUTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Fla. Stat. § 688.002(1). "Misappropriation" includes the acquisition of a trade secret by a person who knows or has reason to know that it was acquired by improper means, and the disclosure or use of a trade secret without consent by a person who used improper means to acquire it. Fla. Stat. § 688.002(2)(a), (b)(1).

105. Bishop misappropriated Sencore's trade secrets. After his employment ended and his authorization to use Sencore's CRM system was revoked, Bishop logged in to the Method:New portal from his personal IP address and, between September 18 and 19, 2026, exported up to 37,000 customer records, which comprises the entirety of Sencore's customer database. That acquisition was accomplished through improper means, including theft, electronic espionage, and breach of

his duty under the Agreement to maintain the secrecy of Sencore's confidential information. Fla. Stat. § 688.002(1), (2)(a).

106. Bishop has also used, and continues to use, Sencore's trade secrets without Sencore's consent by using the exported data to identify, target, solicit, and sell to Sencore's customers, including customers in Florida, Texas, Ohio, Iowa, and potentially many other states. Fla. Stat. § 688.002(2)(b)(1).

107. Bishop Enterprises is also liable for misappropriation. Bishop is its only officer and its registered agent, so Bishop Enterprises knew that the trade secrets it received from Bishop were acquired by improper means. Bishop Enterprises has used and continues to use those trade secrets to solicit and sell to Sencore's customers and to generate the revenue described in Paragraphs 64 through 66. Fla. Stat. § 688.002(2)(a), (2)(b)(2)(a).

108. As a direct and proximate result of Defendants' misappropriation, Sencore has suffered and continues to suffer damages, including the actual loss caused by the misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss, or, alternatively, a reasonable royalty for Defendants' unauthorized disclosure or use. Fla. Stat. § 688.004(1).

109. Defendants' misappropriation was willful and malicious. Bishop secretly formed a competing business months before resigning, exploited a security gap he knew existed, attempted to export Sencore's entire customer database on a weekend from his home internet connection and succeeded at least in part, and continued using the data he stole after receiving Sencore's cease-and-desist demands. Sencore is therefore entitled to exemplary damages "in an amount not exceeding twice any award made under subsection (1)," Fla. Stat. § 688.004(2), and to its reasonable attorney's fees, Fla. Stat. § 688.005.

110. “Actual or threatened misappropriation may be enjoined,” and “[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.” Fla. Stat. § 688.003(1), (3).

111. Defendants’ misappropriation is actual and ongoing. For the reasons set forth in Paragraphs 90 through 94, Sencore is suffering irreparable harm, has no adequate remedy at law, faces a threatened injury that outweighs any harm to Defendants, and seeks relief that serves the public interest. Sencore is therefore entitled to temporary, preliminary, and permanent injunctive relief, including the relief described in Paragraphs 95 and 96.

WHEREFORE, Sencore respectfully requests that this Court enter judgment on Count II in its favor and against Bishop and BSE, and grant the following relief:

a. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Bishop and BSE from accessing, using, or disclosing Sencore’s trade secrets and from directly or indirectly soliciting, contacting, or doing business with any customer of Sencore, including but not limited to all customers reflected in Sencore’s CRM database;

b. An order requiring Bishop and BSE to return to Sencore all copies of Sencore’s confidential customer data, in accordance with the preservation and forensic-imaging procedures set forth below, and to identify under oath all copies of Sencore’s data, the location of each copy, all transfers of that data, and every person who received it;

c. An order requiring Bishop and BSE to preserve all Sencore data and all devices, cloud accounts, and email accounts containing or potentially containing it, and to submit those devices and accounts to a neutral forensic examiner for forensic imaging and preservation; after imaging and preservation are complete and under the examiner’s supervision, to delete and

permanently destroy all copies of Sencore's confidential customer data in their possession, custody, or control and to certify such deletion and destruction under oath, and to provide a sworn compliance report within 7 days;

d. An order requiring Bishop and BSE to provide a complete accounting of all business transacted with any Sencore customer since Bishop's resignation on September 10, 2026, including identification of each customer contacted, the nature and amount of each transaction, and the revenue and profits derived therefrom;

e. Damages for actual loss and unjust enrichment, or in the alternative a reasonable royalty, and exemplary damages of up to twice that amount, under Florida Statutes § 688.004(1)–(2), in an amount to be determined at trial;

f. Reasonable attorney's fees and costs pursuant to Florida Statutes § 688.005;

g. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

h. Such other and further relief as this Court deems just and proper.

## COUNT III
## BREACH OF NON-COMPETITION COVENANT
(Against Bishop)

112. Sencore re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 78 above as though fully set forth herein.

113. As a condition of his employment with Sencore, Bishop executed the Agreement, which included a covenant not to compete with Sencore for a one-year restricted period following separation from employment and subject to a reasonable geographic limitation implied by Florida law.

114. The non-competition covenant in Bishop's signed Agreement is enforceable under Florida Statutes § 542.335 and protects the legitimate business interests identified in Paragraph 33. *See* Fla. Stat. § 542.335(1)(b)(1) to (4).

115. Bishop has breached the non-competition covenant by establishing and operating Precision Edge, a business that directly competes with Sencore in the sale of diamond tools and related products, subject to the reasonable geographic limitation implied by Florida law and during the one-year restricted period following separation from employment.

116. Pursuant to Florida Statutes § 542.335(1)(j), Sencore is entitled to a presumption of irreparable injury upon proof of the violation of an enforceable restrictive covenant. Independent of any statutory presumption, Sencore is suffering and will continue to suffer actual and imminent irreparable injury as a result of Bishop's breach of the non-competition covenant. Bishop has already sold competing products to Sencore customers, including a landscaping customer located in Ohio and two concrete contractor customers located in Iowa; is soliciting other Sencore customers; retains the exported customer data; and refused Sencore's September 21, 2026 and October 2, 2026 cease-and-desist demands to stop competing, return the data, and comply with the Agreement. These facts establish an actual and imminent threat of further customer diversion and loss of goodwill, including from accounts generating approximately $2 million of Sencore's annual revenue, and that harm cannot be readily measured or adequately remedied in money.

117. As a direct and proximate result of Bishop's breach of the non-competition covenant, Sencore has suffered and continues to suffer substantial damages, including but not limited to lost profits, lost customer relationships, lost goodwill, and diminished competitive position, in an amount to be determined at trial.

WHEREFORE, Sencore respectfully requests that this Court enter judgment on Count III in its favor and against Bishop, and grant the following relief:

a. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Bishop, and all persons acting in active concert or participation with him, including Bishop Enterprises, from engaging in any business activity that competes with Sencore in the sale of diamond tools and related products within the reasonable geographic limitation implied by Florida law and for the one-year restricted period following separation from employment;

b. Compensatory damages for breach of the non-competition covenant in an amount to be determined at trial;

c. Reasonable attorney's fees and costs pursuant to Florida Statutes § 542.335(1)(k);

d. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

e. Such other and further relief as this Court deems just and proper.

## <u>COUNT IV</u><br>BREACH OF NON-SOLICITATION COVENANT

(Against Bishop)

118. Sencore re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 78 above as though fully set forth herein.

119. The Agreement executed by Bishop included a covenant not to solicit Sencore's customers, employees, or vendors for a defined period following separation from employment.

120. The non-solicitation covenant is enforceable under Florida Statutes § 542.335 and protects Sencore's legitimate business interests, including its substantial relationships with specific prospective and existing customers, such as the high-value accounts Sencore assigned and

reassigned to Bishop during his employment, and the customer goodwill associated with Sencore's ongoing business. *See* Fla. Stat. § 542.335(1)(b)(3)–(4).

121. Bishop has breached the non-solicitation covenant by actively soliciting Sencore's customers through multiple channels, including his public TikTok account (@joshthebladeguy), direct communications with Sencore's existing customers, and the use of Sencore's misappropriated CRM data containing 37,000 customer records.

122. Specifically, Bishop has solicited known Sencore customers in at least four states, including a floor removal customer located in Florida, a lawn and home customer located in Texas, a landscaping customer located in Ohio, and two concrete contractor customers located in Iowa, and has sold competing products to at least the Ohio landscaping customer and the two Iowa concrete contractor customers. Bishop has used his knowledge of Sencore's customer relationships, purchasing histories, and pricing terms, which he obtained solely through his employment with Sencore and his unauthorized access to Sencore's CRM system, to target and solicit Sencore's customers for the benefit of himself or his competing business, Bishop Enterprises.

123. Pursuant to Florida Statutes § 542.335(1)(j), Sencore is entitled to a presumption of irreparable injury upon proof of the violation of an enforceable restrictive covenant. Independent of any statutory presumption, Sencore is suffering and will continue to suffer actual and imminent irreparable injury as a result of Bishop's breach of the non-solicitation covenant. Bishop has already sold competing products to Sencore customers, including a landscaping customer located in Ohio and two concrete contractor customers located in Iowa; is soliciting other Sencore customers; retains the exported customer data; and refused Sencore's September 21, 2026 and October 2, 2026 cease-and-desist demands to stop soliciting, return the data, and comply with

the Agreement. These facts establish an actual and imminent threat of further customer diversion and loss of goodwill, including from accounts generating approximately $2 million of Sencore's annual revenue, and that harm cannot be readily measured or adequately remedied in money.

124. As a direct and proximate result of Bishop's breach of the non-solicitation covenant, Sencore has suffered and continues to suffer substantial damages, including but not limited to lost profits, lost customer relationships, and lost goodwill, in an amount to be determined at trial.

WHEREFORE, Sencore respectfully requests that this Court enter judgment on Count IV in its favor and against Bishop, and grant the following relief:

a. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Bishop, and all persons acting in active concert or participation with him, including Bishop Enterprises, from directly or indirectly soliciting, contacting, or doing business with any customer of Sencore, including but not limited to all customers reflected in Sencore's CRM database, for the one-year restricted period following separation from employment;

b. An order requiring Bishop to provide a complete accounting of all business transacted with any Sencore customer since his resignation on September 10, 2026, including identification of each customer contacted, the nature and amount of each transaction, and the revenue and profits derived therefrom;

c. Compensatory damages for breach of the non-solicitation covenant in an amount to be determined at trial;

d. Reasonable attorney's fees and costs pursuant to Florida Statutes § 542.335(1)(k);

e. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

f. Such other and further relief as this Court deems just and proper.

**COUNT V**
**BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY**
(Against Bishop)

125. Sencore re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 78 above as though fully set forth herein.

126. During his employment with Sencore, Bishop occupied a position of trust and confidence as an Account Manager with extensive access to Sencore's most sensitive confidential business information, including Sencore’s CRM system, pricing data, purchasing histories, and sales strategies. Bishop was personally responsible for approximately $2 million of Sencore's annual revenue and served as the primary point of contact between Sencore and a significant portion of its customer base.

127. By virtue of this position of trust and confidence, Bishop owed fiduciary duties and a duty of loyalty to Sencore, including but not limited to: (a) a duty of good faith and fair dealing; (b) a duty not to compete with Sencore during the period of his employment; (c) a duty not to misappropriate Sencore's trade secrets or confidential information; (d) a duty to return all company property upon separation; and (e) a duty not to act against Sencore's interests for his own personal gain. *See Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (recognizing fiduciary obligations arising from relationships involving trust and confidence); *Gracey v. Eaker*, 837 So. 2d 348 (Fla. 2002).

128. Bishop breached his fiduciary duties and duty of loyalty to Sencore by, among other things:

(a) Upon information and belief, while still employed by Sencore, removing his entire personnel file, including the executed original of his Agreement, from Sencore’s file cabinet and retaining or destroying it, in an effort to eliminate the evidence of his contractual obligations before his planned departure;

(b) Accessing Sencore’s CRM system without authorization after his resignation and exporting up to 37,000 customer records — the entirety of Sencore’s customer database — for the purpose of using this confidential information in his competing business;

(c) Secretly establishing Bishop Enterprises as a directly competing business in March 2026 approximately six months before his resignation, for the purpose of diverting Sencore's customers and revenue;

(d) Soliciting Sencore’s existing customers, including a floor removal customer located in Florida, a lawn and home customer located in Texas, a landscaping customer located in Ohio, and two concrete contractor customers located in Iowa, using confidential information obtained through his employment with Sencore; and

(e) Publicly promoting his competing business on social media (TikTok @joshthebladeguy) in a manner designed to divert Sencore’s customers and damage Sencore’s business reputation and goodwill.

129. Bishop’s breach of fiduciary duty is not predicated solely on trade secret misappropriation. Rather, it rests on Bishop’s repeated acts of disloyalty while he held a position of trust as a key employee. Bishop’s removal, upon information and belief, of his own personnel

file while still employed, his secret formation of a competing business six months before his departure, his post-resignation access to Sencore's CRM system, and his public solicitation of Sencore's customers are each independent breaches of his fiduciary duties that are actionable apart from any trade secret claim.

130. As a direct and proximate result of Bishop's breach of fiduciary duty and duty of loyalty, Sencore has suffered and continues to suffer substantial damages, including but not limited to lost profits, lost customer relationships, lost goodwill, diminished competitive position, and the cost of investigating and remedying Bishop's misconduct, in an amount to be determined at trial.

WHEREFORE, Sencore respectfully requests that this Court enter judgment on Count V in its favor and against Bishop, and grant the following relief:

a. An order requiring Bishop to return to Sencore all property belonging to Sencore, including his personnel file and the executed original of the Agreement;

b. An order requiring Bishop to provide a complete accounting of all business transacted with any Sencore customer since his resignation on September 10, 2026, including identification of each customer contacted, the nature and amount of each transaction, and the revenue and profits derived therefrom;

c. Compensatory damages for breach of fiduciary duty and duty of loyalty in an amount to be determined at trial;

d. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

e. Such other and further relief as this Court deems just and proper.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**
(Against Both Defendants)

131. Sencore re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 78 above as though fully set forth herein.

132. Sencore has existing and prospective advantageous business relationships with its customers, including but not limited to the approximately 37,000 customers reflected in its CRM database. These relationships have been cultivated over many years through significant investment of time, effort, and resources, and they constitute valuable business assets.

133. Bishop and BSE have knowledge of Sencore's business relationships with its customers. Bishop has intimate, first-hand knowledge of these relationships because Sencore assigned him many of its best customers, including the top accounts of departing sales representatives, and he was personally responsible for approximately $2 million of Sencore's $12 million in annual revenue. Bishop also has knowledge obtained through his unauthorized access to and export of Sencore's CRM data containing 37,000 customer contacts.

134. Bishop and BSE have intentionally and unjustifiably interfered with Sencore's existing and prospective business relationships by soliciting and diverting Sencore's customers for the benefit of Bishop Enterprises. This interference has been accomplished through, among other things: (a) the use of Sencore's misappropriated CRM data to identify and target Sencore's customers; (b) direct solicitation of Sencore's customers, including a floor removal customer located in Florida, a lawn and home customer located in Texas, a landscaping customer located in Ohio, and two concrete contractor customers located in Iowa; (c) public solicitation of customers in the diamond tools industry through Bishop's TikTok account (@joshthebladeguy); and (d)

offering competing products at prices informed by Bishop's knowledge of Sencore's confidential pricing data.

135. Defendants' interference with Sencore's business relationships is independently actionable because it was accomplished through improper means, including breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and unauthorized computer access.

136. As a direct and proximate result of Defendants' tortious interference, Sencore has suffered and continues to suffer substantial damages, including but not limited to lost profits, lost customer relationships, lost goodwill, and diminished competitive position, in an amount to be determined at trial.

WHEREFORE, Sencore respectfully requests that this Court enter judgment on Count VI in its favor and against Bishop and BSE, and grant the following relief:

a. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Bishop and BSE from directly or indirectly soliciting, contacting, or doing business with any customer of Sencore, including but not limited to all customers reflected in Sencore's CRM database;

b. An order requiring Bishop and BSE to provide a complete accounting of all business transacted with any Sencore customer since Bishop's resignation on September 10, 2026, including identification of each customer contacted, the nature and amount of each transaction, and the revenue and profits derived therefrom;

c. Compensatory damages for tortious interference with business relationships in an amount to be determined at trial;

d. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

e. Such other and further relief as this Court deems just and proper.

**COUNT VII**
**CONVERSION**
(Against Bishop)

137. Sencore re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 78 above as though fully set forth herein.

138. Conversion is an act of dominion wrongfully asserted over another's property inconsistent with the owner's rights therein.

139. Upon information and belief, Bishop converted Sencore's property, namely Bishop's entire personnel file, including the executed original of the Agreement, by removing it from Sencore's file cabinet while still employed by Sencore and retaining or destroying it, thereby exercising dominion and control over it in a manner inconsistent with Sencore's ownership rights.

140. Bishop also converted Sencore's confidential CRM data, comprising up to 37,000 customer records, by accessing Sencore's Method CRM system without authorization after his resignation and exporting that data for his own use. Bishop has exercised dominion and control over this proprietary information in a manner inconsistent with Sencore's rights by using it to operate his competing business, Bishop Enterprises.

141. As a direct and proximate result of Bishop's conversion of Sencore's property, Sencore has suffered and continues to suffer substantial damages, including but not limited to the value of the converted property, lost profits, and consequential damages, in an amount to be determined at trial.

WHEREFORE, Sencore respectfully requests that this Court enter judgment on Count VII in its favor and against Bishop, and grant the following relief:

a. An order requiring Bishop to return to Sencore all converted property, including his personnel file, the executed original of the Agreement, and all copies of Sencore's confidential customer data;

b. Compensatory damages for conversion in an amount to be determined at trial;

c. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

d. Such other and further relief as this Court deems just and proper.

Respectfully submitted,
Nason Yeager Gerson Harris & Fumero, P.A.

Dated: October 12, 2026

*s/ Aaron J. Kesselman*
Aaron J. Kesselman, Esq.
Florida Bar No. 1018107
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410
Telephone: (561) 686-3307
Email: akesselman@nasonyeager.com
mcarney@nasonyeager.com
*Attorneys for Plaintiff,*
*Atlantic Diamond Tools, Inc.*
*d/b/a Sencore Diamond Tools*

Docusign Envelope ID: 46B77520-839D-8DAA-82C3-E5F8C3FC00F2

**VERIFICATION**

I declare under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified Complaint and that the facts stated therein are true and correct. I am authorized to make this declaration on behalf of Atlantic Diamond Tools, Inc. d/b/a Sencore Diamond Tools.

Executed on: October 12, 2026 | 1:44:16 PM PDT

DocuSigned by:
A0748421FDE044D...
Name: JD Lubitz

Title: Director of Operations of Atlantic Diamond Tools, Inc. d/b/a Sencore Diamond Tools

# Exhibit A

# EMPLOYEE CONFIDENTIALITY, NON-COMPETE, AND NON-SOLICITATION AGREEMENT

This EMPLOYEE CONFIDENTIALITY NON-COMPETE, NON-SOLICITATION AGREEMENT ("Agreement") is made this _______ day of _________, 20__ by and between Atlantic Diamond Tools, inc. d/b/a/ Sencore Diamond Tools, a Florida Corporation ("Sencore") and______________________ ("Employee") (collectively "the Parties").

WHEREAS, Sencore is offing employment to the Employee and wishes to protect its confidential information and other legitimate business interests.

NOW THEREFORE in consideration of the mutual promises and covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Restrictive Covenants.**

A. **Confidentiality.** Employee agrees that both during the Employee's employment with Sencore and thereafter employee will not disclose to any third party or use in any way (except in performing the employee's duties while employed by Sencore in furtherance of the best interests of Sencore) any confidential information, business secrets, or business opportunity of Sencore including but not limited to, advertising and promotional ideas and strategies, technology, business plans, customer and supplier lists, employment or personnel data or information and data relating to general business operations such as sales, costs, profits, leads, and pricing structure (Confidential information). Immediately upon termination of employment with Sencore or at any time upon the request of Sencore, employee will return to Sencore (i) all memoranda notes and data, computer hardware and software, records or other documents compiled by Employee or made available to Employee during Employee's employment with Sencore concerning business of Sencore or its customers, (ii) all other Confidential Information, and (iii) all personal property of Sencore including, but not limited to files, records, documents, lists equipment, supplies, keys, and similar items and all copies thereof.

B. **No Solicitation of Customers.** Employee agrees that Sencore has spent considerable effort, time, and resources to cultivate and form business relationships with customers and that Sencore has legitimate and substantial interests in protecting and maintaining these relationships. Employee, therefore, agrees that, both during Employee's employment and for (1) year following termination of Employment with Sencore, Employee will not directly or indirectly, on Employee's own behalf or the behalf of any other person or entity, solicit business of any Customer, "Customer" shall mean any past, current, prospective, or potential customer with which Sencore has business relationship or is reasonably anticipated to develop relationships as of the termination of Employee's employment with Sencore.

C. **No Solicitation of Employees, Sub-contractors, Vendors or Suppliers** Employees agree that both during Employee's employment with Sencore and for a period of (1) year following the termination of Employee's employment with Sencore, Employee will not directly or indirectly, on the Employee's own behalf or the behalf of any person or entity, hire or solicit to hire for employment or consulting or other provision of services, any person who is actively employed or engaged in (or in the preceding six (6) months was actively employed or engaged) by Sencore. This includes, but is not limited to, inducing or attempt to induce any sub-contractor, vendor, or supplier of Sencore to terminate, reduce or alter any relationship or business with from Sencore.

D. **Non-Competition.** During Employee's employment with Sencore and for a period of one (1) year following the termination of Employee's with Sencore Employee shall not, on Employee's own behalf or on the behalf of others, directly or indirectly be employed by, perform service for, or hold any ownership interest in any business engaged in the business of making or selling diamond blades or tools.

2. **Enforcement.**

Employee acknowledges and agrees that the restrictions contained in Section 1 are necessary to protect the legitimate business interests of Sencore. Employee acknowledges that all of the restrictions on Section 1 are reasonable in all respects, including duration and scope of activity. Employee agrees that the restrictions contained in Section 1 shall be construed as a separate agreement independently of each other provision of this Agreement or any other agreement between Employee and Sencore. Employee agrees that the existence of a claim or cause of action by Employee against Sencore shall not constitute a defense to the enforcement by Sencore of the covenants and restriction in Section 1. Employee agrees that the injury Sencore will suffer in the event of breach of any provision of Section 1 of this Agreement by

Employee will cause Sencore irreparable injury that cannot be adequately compensated by monetary damages alone and, therefore, Employee agrees that Sencore without limiting any other legal or equitable relief available to it shall be entitled to obtain equitable relief by injunction otherwise from any court of competent jurisdiction, including injunctive relief to prevent Employee's failure to comply with the terms and provisions of Section1. The periods of time referred in subsection (B), (C) and (D) shall be toiled on a day-to-day basis for each day during which Employee violates the provisions of those subsections in any respect so that the Employee is restricted from engaging in the activities prohibited by those subsections for the full-time period stated.

3. **Employment-At-Will.**

__________Employee acknowledges and agrees that Employee's employment with Sencore is "at will" employment. Employee is free to resign and terminate Employee's employment with Sencore at any time for any reason. Sencore is free to terminate Employee's employment at any for any reason. Notwithstanding any other provision of the agreement this agreement is not intended to create, and shall not be construed to create, a contract of employment or other modification to Employee's "At will" status.

4. **Assignment.**

__________Neither party may assign this Agreement without the prior written authorization of the other, except that Sencore may assign the Agreement, including the Non-Competition covenant, to any entity acquiring all or substantially all of the business of Sencore.

5. **Waiver or Modification.**

__________Any waiver by Sencore of a breach of any provision of this Agreement shall not operate or be construed to be, a waiver of any other breach of such provision of this Agreement. The failure of Sencore to insist on strict adherence to any term of this Agreement on one or more occasions shall not consider a waiver of Sencore's right to thereafter insist on strict adherence to that term or any other term of this Agreement. Neither this Agreement nor any portion thereof may be waived, changed, or terminated orally. Instead, any waiver, modification or amendment must be in writing signed by both parties.

6. **Choice of Law.**

__________This Agreement will be governed, construed, and enforced by the laws of the State of Florida, without regard to conflict of laws rules.

7. **Entire Agreement.**

__________This Agreement contains the entire understanding of the Parties to the subject matter herein and supersedes all other prior written or oral agreements, understanding or arrangement relating to the same subject matter. Employee acknowledges that, in entering into this Agreement, Employee does not rely and has not relied on any statements or representations not contained in this Agreement.

8. **Severability.**

__________Any term or provision of this Agreement this is determined to be unenforceable or invalid by a court of competent jurisdiction in any jurisdictions shall be ineffective to the extent of such unenforceability or invalidity without rendering the remaining terms and provisions unenforceable or invalidity without rending or validity of any of the terms or provisions of this Agreement in any other jurisdiction and such unenforceable or invalid provision shall be modified by the court to that it is enforceable to the extent allowed by applicable law.

9. **Survival.**

__________The covenants, representations, arrangements, and warranties contained in this Agreement shall survive the termination of Employment with Sencore.

**AGREED AND EXECUTED as of the date first written above.**

| | |
|---|---|
| **ATLANTIC DIAMOND TOOLS, INC.**<br>**D/B/A SENCORE DIAMOND TOOLS** | **EMPLOYEE** |
| **By:** ____________________________ | ____________________________ |
| **Title:** ____________________________ | **Date:** ______________________ |
| **Date:** ____________________________ | |

# Exhibit B

# Incident Evidence Report

PL-65934 — Account activity and Contact exports

Prepared September 22, 2026

| | |
|---|---|
| **Account** | sencorediamondtools |
| **Account identity reviewed** | Joshua Bishop — josh@sencoretools.com |
| **Method identity** | 1baae2cc-8221-4280-ad50-632310c19a22 |
| **User / account identifiers** | User record 10; account 31387 |

## Summary

Available records confirm that the Method account identity assigned to Joshua Bishop remained able to access the sencorediamondtools account through Method:New after September 11, 2026. The September 18 database backup indicates that the user was not fully deactivated: “User can sign in?” was set to No, while “Active” remained Yes and the Method:New account membership remained active. Only Classic sign-in had been restricted. Because full account deactivation was not completed, Method:New access continued.

The records conclusively establish that the authenticated Method account assigned to Joshua Bishop initiated six Contact exports on September 18–19. The final “Grid Exported” event records the same Method identity and IP address—73.124.212.48—as the associated sign-in activity. CloudFront’s aggregate reporting separately records later requests for at least two exported files; however, those file-request records do not identify the requester, IP address, browser, or device. The evidence therefore confirms the export actions, but not whether Joshua Bishop personally downloaded the resulting files.

## Account and sign-in evidence

| User Name | Notification Email | User can sign in? | Active | |
|---|---|---|---|---|
| Joshua Bishop | josh@sencoretools.com | No | Yes | Edit... |

**Exhibit 1 — Joshua Bishop access status as of September 18, 2026.**
The column headings and subject row are shown as unaltered crops from the same source screenshot; unrelated user rows have been omitted.

Six sign-in records were identified after the reported September 11 removal. All six records were associated with the same Method identity, email address, account, IP address, browser profile, and device fingerprint.

| Sign-in dates — EDT | Recorded connection details |
| --- | --- |
| September 12, 13, 14, 16 and 18, 2026 | 73.124.212.48; Chrome 152 on 64-bit Windows 10; 1920 × 1080 screen; 8 GB reported device memory |
| Most recent supplied sign-in | September 18, 2026 at 7:03:25 PM EDT |
| Approximate IP geolocation | The Acreage / Loxahatchee Groves area, Florida, United States |

IP geolocation is approximate. These details describe the recorded account session and do not establish the identity of the natural person operating the device.

## Confirmed Contact exports

| Created — EDT | Export file | Size |
| --- | --- | --- |
| Sep 18, 7:17:22 PM | contacts_09-18-2026_07_17_14_pm.csv | 4,711,175 bytes |
| Sep 19, 11:00:11 AM | contacts_09-19-2026_11_00_01_am.csv | 4,711,175 bytes |
| Sep 19, 11:01:28 AM | contacts_09-19-2026_11_01_19_am.csv | 4,711,175 bytes |
| Sep 19, 12:59:46 PM | contacts_09-19-2026_12_59_38_pm.csv | 4,592,231 bytes |
| Sep 19, 2:00:01 PM | contacts_09-19-2026_01_59_53_pm.csv | 4,592,231 bytes |
| Sep 19, 2:00:40 PM | contacts_09-19-2026_02_00_33_pm.csv | 4,592,231 bytes |

An analytics event recorded at September 19, 2026 at 2:00:33 PM EDT associates the final export with the same Method identity and IP address recorded for the sign-ins—73.124.212.48—using Chrome on Windows 10 in Method:New. The resulting file record was created approximately seven seconds later. This establishes that the authenticated account initiated the export from that IP address; it does not independently establish the identity of the natural person operating the account.

## File-request evidence

CloudFront's Popular Objects report for September 19 records:

| Export file | Requests | Cache hits |
| --- | --- | --- |
| contacts_09-19-2026_11_01_19_am.csv | 3 | 2 |
| contacts_09-18-2026_07_17_14_pm.csv | 3 | 0 |

These records establish that CloudFront received requests for the identified export files. They do not, by themselves, identify the requester or conclusively establish that the complete files were saved or opened.

## Limitations

- No conclusive record was found showing use of the export link contained in the completion email.
- Email-provider records were not available to confirm final email delivery or opening.
- Detailed CloudFront access logging, CloudFront real-time logging, and S3 server access logging were not enabled when reviewed.
- The CloudFront aggregate report does not contain client IP, device, browser, exact request time, or authenticated user identity.
- The export links were account-scoped or temporary signed links. A file request cannot therefore be attributed to a particular natural person solely from the available records.

> **Important:** IP address 73.124.212.48 is recorded for both the account sign-ins and the final “Grid Exported” event. It is evidence of the IP used by the authenticated account to initiate that export, but it does not independently identify the natural person operating the account. It must not be represented as the IP address used for the later CloudFront file requests.

## Conclusion

The records establish that the user was not fully deactivated: Classic sign-in was restricted, but the active status and Method:New membership remained enabled. The Method identity assigned to Joshua Bishop authenticated after the reported removal date and was associated with six Contact exports. The final export event records IP address 73.124.212.48, the same IP recorded for the sign-ins. CloudFront subsequently recorded requests for at least two resulting files. Because request-level access logs were not available, the evidence does not conclusively establish that Joshua Bishop personally operated the account, requested, received, opened, or downloaded the files, and it does not identify the IP address or device used for the CloudFront file requests.